**BERLANDI NUSSBAUM & REITZAS LLP**
125 Park Avenue, 25th Floor
New York, New York 10017
(212) 804-6329 (Ph)
(646) 461-2312 (fax)
*Attorneys for Plaintiff Dr. Lori A. Brightman*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DR. LORI A. BRIGHTMAN, an individual, | : **CASE** No.: |
| | : |
| Plaintiff, | : **COMPLAINT** |
| | : |
| v. | : |
| | : |
| INMODE LTD., a foreign limited liability | : **JURY DEMANDED** |
| corporation; DOES 1 – 10, INCLUSIVE; | : |
| AND ROE CORPORATIONS 11-20, | : |
| INCLUSIVE, | : |
| | : |
| Defendants. | : |

Plaintiff, Dr. Lori A. Brightman ("Dr. Brightman"), by and through her attorneys, Berlandi

Nussbaum & Reitzas LLP, and for causes of action against Defendant INMODE LTD. ("InMode"

or "Defendant"), alleges as follows:

<u>**JURISDICTION**</u>

1.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Dr. Brightman

is a citizen of Massachusetts, and InMode is neither incorporated nor maintains its principal place

of business in New York.

2.      Dr. Brightman seeks monetary damages based on the worth of the InMode's

corporate stock which Defendant refuses to transfer and has a value at the time of this filing in

excess of $75,000.00.

3.      The Court has the authority to grant declaratory relief pursuant to the Declaratory

Judgment Act, 28 U.S.C. §§ 2201 and 2202.

4.      Venue is appropriate under 28 U.S.C. §1391(b)(2), because a substantial part of the

events giving rise to Dr. Brightman's claims occurred in New York, including among other things, performance of services requested by Defendant, including a clinical trial InMode specifically requested and had been performed by Dr. Brightman in her office located in New York County.

5.      Pursuant to FRCP 38, Plaintiff hereby demands trial by jury.

## JURISDICTION

6.      Dr. Lori A. Brightman is an individual who resides in the Commonwealth of Massachusetts.

7.      Dr. Brightman is a widely renowned board-certified dermatologist and dermatologic surgeon who has published countless medical journals and articles. In addition, she has served as the Chair of the *Ethics and Conflict of Interest Committee* for the American Society for Laser Medicine and Surgery, faculty of the American Society for Dermatologic Surgery, and a physician in the *Dermatology and Dermatologic Surgery Department* at Massachusetts Institute of Technology (MIT). Dr. Brightman has also received the *Bertha Curtis Humanitarian Award* for her work with, and creation of, the charitable foundation *Kindness for Kids*. Dr. Brightman has been licensed as a physician since approximately 2001.

8.      In addition to her experiences in private practice, Dr. Brightman is an international trainer, researcher, developer, principal and co-investigator of clinical trials in a broad range of therapeutics including but not limited to various injectables and laser manufacturers. She provides product development support, trains other physicians on best practices and counsels attorneys, investors, consultants and media regarding these various products including specifically medical devices such as Bi-Polar Fractional RF devices.

9.      InMode is and was at all times relevant hereto a foreign corporation incorporated in Israel, and upon information and belief, maintains its principal place of business in Lake Forest, California. InMode is a provider of surgical aesthetic and medical treatment solutions. It incorporated in Israel in January 2008 under the name Invasix Ltd. The corporate name was changed to InMode Ltd. in November 2017. InMode regularly conducts business in the State of New York and many of the events and circumstances in this pleading occurred in New York

2

County, including services such as a clinical trial performed by Dr. Brightman.

10.     At all relevant times mentioned herein, Moshe Mizrahy was CEO of Invasix, Inc. which corporate name was later changed to "InMode Ltd".

11.     At all relevant times, Brian Lodwig was President, North America Division of Invasix, Inc. which corporate name was later changed to "InMode Ltd".

12.     InMode failed to honor promises to Dr. Brightman despite having received the benefit of Dr. Brightman's services.

## GENERAL ALLEGATIONS

I.     **Dr. Brightman's Prior Dealings With Invasix/InMode and the 2009 Clinical Trial Agreement**.

13.     Dr. Brightman was introduced to Brian Lodwig ("Lodwig") and Moshe Mizrahy ("Mizrahy") through her work with Syneron beginning in 2008. Mizrahy was CEO of Syneron at that time.

14.     Lodwig and Mizrahy left Syneron and began Invasix. Initially, Mizrahy began discussing Invasix technology with Dr. Brightman. At the time, Dr. Brightman was a highly regarding expert experienced with developing technology, running clinical trials, and publishing and presenting internationally.

15.     In early 2009, offered 7,500 InMode stock options to Dr. Brightman to be available when Defendant went public in exchange for her performance of procedures on 15 patients in a clinical trial.  By email of April 5, 2009, Moshe Mizrahy wrote:

> Date: Sun, 5 Apr 2009 11:17:03 +0300
>
> Dear Lori,
>
>     Again, I would like to take this opportunity to thank you for making the trip to Toronto. I hope you enjoyed the training.
>
>     In this e-mail I would like to summarize the discussion that you, Dr. Michael Kreindel, and I had in Toronto.
>
>     You will conduct a study for Invasix that will include 15 patients to be

divided into two groups: 7-8 patients will be treated on the neck and the other 7-8 patients will be treated on the upper arms (see enclosed some pictures that we took of the first neck treatment conducted by Dr. Steve Mulholland in Toronto, using the 12 cm. handpiece we showed you in Toronto).

Yang will help with the site approval. If she needs anything from you, she will contact you directly.

The study that you will conduct is very important to us - it will serve us to communicate the message of small area shaping and tightening to the dermatologist community. As we told you, we do not intend to work with other dermatologists on Invasix (we are currently concentrating on the plastic surgeon community) so we see you as our opinion leaders in the derm community.

In this study, we would like to prove the mechanism of operation of our technology as a superior mechanism vis a vis other methods of laser and ultrasound. Therefore, as we discussed, the study will include 3 venues of gold-standard clinical proof: before and after 3 D pictures using the Canfield Vectra system, histologies and skin tightening and laxity analysis. As you told us, you are capable of analyzing the results throught these 3 venues. We are therefore willing to add as per your request the $ 500 per patient in addition to what is specified in our contract.

In addition, I would like to tell you that the Board of Directors of Invasix has approved allocating 7,500 options to you, to be vested over 3 years, as of January 1st, 2009.

I look forward to working closely with you and to beginning our study. Once we receive site approval - we will ship you a system and Dr. Michael Kreindel will come to work with you on the first case.

Moshe Mizrahy
CEO, Invasix
Cell: +972-547-486900
E-mail: mm_bsg@barak.net.il <mailto:mm_bsg@barak.net.il>


16.     Dr. Brightman recognized that Mizrahy was the CEO of Invasix (which later became InMode) and she relied on his actual or apparent authority to bind defendant. Dr. Brightman agreed to this limited clinical trial to be performed in her office in New York in exchange for the 7,500 stock options promised by Mizrahy. Dr. Brightman then proceeded to complete a clinical trial in her New York office for surgical procedures of Radiofrequency-

Assisted Liposuction ("RFAL") on 15 patients along with documentation of the results including 3D Vectra measurements, histology and assessment of skin tightening.

17.     The study was intended to prove the mechanism of operation of RFAL as a superior mechanism vis-a-vis other methods of laser and ultrasound. Dr. Brightman commenced treating the clinical trial patients in her New York office on June 30, 2009 under the agreement.

18.     In April, 2010, and after Dr. Brightman had substantially completed the required Clinical Trial work, Mizrahy sent Dr. Brightman a Notice of Stock Option Award ("Written Agreement"), in consideration of the aforesaid specific services viz., clinical trial surgery and data collection for the Clinical Trial.

19.     When Dr. Brightman received the April, 2010 Written Agreement, she noted it incorrectly identified 7,000 shares of stock and not the 7,500 shares promised by Mizrahy on behalf of InMode.

20.     The Written Agreement also included new terms and conditions which were not even discussed or agreed to by the parties.  These new terms were inconsistent with the agreement of the parties otherwise were not supported by a separate or new consideration.

21.     Dr. Brightman objected to the Written Agreement. However, Mizrahy assured Dr. Brightman that he would send a corrected agreement but insisted that she needed to sign it pending receipt of the corrected version. In reliance on Mizrahy's assurance, the written agreement was signed and returned. Ultimately, however, Mizrahy never provided Dr. Brightman with the corrected version.

## II.     Dr. Brightman Agrees to Provide New Services for InMode Outside of the Clinical Trial Agreement

22.     Later in 2009, Lodwig conveyed in a telephone call with Dr. Brightman how much he appreciated Dr. Brightman's work on the Clinical Trial. Lodwig asked Dr. Brightman if she would be interested in providing new services to InMode at upcoming society meetings or by publications she might be able to author or participate in.

23.     He told Dr. Brightman that InMode wanted to keep her as their "only dermatology

key opinion leader" in the derm/aesthetic market. He further told Dr. Brightman that if she agreed to this new work, InMode would compensate her with additional stock options to be provided and available when Defendant went public.

24.     Lodwig advised Dr. Brightman that he was authorized by the Board of Directors to hire her for new work outside of the Clinical Trial and he offered her shares of stock as follows: 5,000 share of stock yearly for attending (live,  virtual, or electronic) meetings (derm meetings, society meetings, aesthetic meetings); any publications (print or electronic) she can get will also be 5,000 shares / publication; international meetings will also be 5,000 shares per international meeting for attending (live, virtual or electronic) international meetings; and 5,000 shares per year for taking potential prospect calls/emails answering InMode's questions.

25.     Dr. Brightman relied on Logwig's actual or apparent authority to bind Defendant, she accepted the offer and she performed the agreed upon services. Thereafter, emails came forth with various requests for work by Dr. Brightman consistent with this Agreement.

26.     Dr. Brightman thus performed additional work with the promised stock options as compensation. The additional work performed consisted of writing, submitting and then presenting abstract and lectures for dermatology, society and aesthetic meetings, international meetings and publications, and fielding calls, emails, inquiries from other physicians regarding RFAL. These were all additional items of work Dr. Brightman performed based on the promises from InMode and its authorized agent Lodwig.

27.     The scope of additional works that Dr. Brightman provided to InMode resulted in her earning 45,000 additional options for 2009 - 2011 based on the following:

    a.      Attending and presenting at various events such as Dermatologic, Laser, and Aesthetic meetings, and the like for a total of 15,000 options;

    b.      Attending (in person, virtually or electronically) at various events internationally for Dermatologic, Laser, and Aesthetic meeting which included 5 Continents 2009, Dubai Derm 2010 and a Polish Trade magazine 2011 for a total of 15,000 options; and

c.      Three (3) publications in: i) Skin and Allergy News; ii) ASDS Media; and

iii) A Polish Trade magazine for a total of 15,000 stock options.

28.     At all times herein, Lodwig was a duly authorized representative of InMode and/or

had the actual and/or apparent authority to act and negotiate with Dr. Brightman on behalf of

InMode. Dr. Brightman reasonably and justifiably relied on Lodwig's actual or apparent authority

to transact business of InMode by providing services and devoting time for the benefit of InMode.

29.     Lodwig advised Dr. Brightman that the options were to be of the same kind that

Lodwig himself would receive as an InMode executive, though the precise value of each share of

stock would not be known until the company went public when the shares would be provided.

Lodwig advised Dr. Brightman that her options were in place and no further documentation was

required.

30.     Dr. Brightman reasonably relied on Lodwig's statements and Lodwig's actual

and/or apparent authority to transact business of InMode and, this reliance was manifested by Dr.

Brightman devoting significant effort and time providing services of value to InMode.

31.     On October 13, 2011, Dr. Brightman met with Lodwig in her office with Chris

Yackel, Senior Territory Manager at Invasix. During this meeting, Lodwig reviewed with Dr.

Brightman all the additional work she had done for RFAL promotion, which by then had reached

the equivalent of 45,000 stock options. Lodwig further confirmed to Dr. Brightman that she was

indeed "covered for those options" and no further documentation was required.  Lodwig added

that "the Board and Mizrahy approved of our agreement.  This is all set."

32.     Dr. Brightman asked Lodwig about any necessary paperwork, and she was assured

by Lodwig, "Lori, do not worry about that, no, this is coming from Moshe (Mizrahy) directly."

"We know the extra work you have done for us (of course outside of the RFAL clinical trial). This

is all set." Both Yackel and Lodwig have an independent recollection of this meeting and both

have confirmed these discussions occurred.

33.     In consideration for her services to promote RFAL, such as presentations,

publications, speaking with other physicians etc., InMode, Lodwig and Mizrahy had agreed to pay

Dr. Brightman a total of 45,000 options in InMode stock.

34.     Those options were Dr. Brightman's only compensation for the extra services she provided.  In performing those services, Dr. Brightman even paid her own expenses for travel and accommodation.

35.     To date, despite request, Dr. Brightman has not received any monetary compensation for, nor was she compensated with the additional 45,000 stock options promised to her for her additional work relating to RFAL.

36.     As of the date of this Complaint, Dr. Brightman has not received the stock options she was promised and in April 2021 was for the first time advised by Mizrahy or other InMode personnel that InMode will not fulfill its promises despite her performance of services requested.

III.     **Dr. Brightman Agrees to Provide Additional Services to Promote Fractora Device for InMode in Exchange for New and Additional Stock Options**

37.     During the same October 13, 2011 meeting between Lodwig and Dr. Brightman, Lodwig said he knew Dr. Brightman had met with Mizrahy recently on September 21, 2011, in her office in New York to discuss her work. Lodwig informed Dr. Brightman that Mizrahy wanted for Dr. Brightman to also work with the Fractora device, which is for minimally invasive anti-aging skin and tissue resurfacing.

38.     He said, "We have spoken about this, this is coming from Moshe, he would like for you to do with Fractora what you did for RFAL, we know what you can do with this."

39.     Further, Lodwig told Dr. Brightman, "We, myself and Moshe (for the Company), are willing to do the same stock option deal we have done with RFAL with Fractora. So, 5,000 yearly for meetings (derm meetings, society meetings, aesthetic meetings), any publications you can get will also be 5,000 and of course international meetings are very important to us so we will also continue to do 5,000 per international meeting and 5,000 for taking potential prospect calls/emails answering their questions."

40.     Dr. Brightman said she would be happy to do the new work for the same compensation arrangement as she had been doing with RFAL.

41.     Dr. Brightman also asked Lodwig if any necessary paperwork was needed for this new work, and again she was assured by Lodwig, "Lori, this is coming from Moshe (Mizrahy) directly (for InMode)." "We know the work you have done for us of course. This is all set."

42.     At that time, Dr. Brightman had worked with Lodwig for years prior when he was employed at Syneron. Lodwig, as well as other Syneron employees, had made promises for compensation for work to be done and had ALWAYS come forth with the promised financial compensation without issue. Based upon these past fulfilled promises, Dr. Brightman believed Lodwig was a person of his word and agreed to continue to do this extra work. She knew this is a very common practice in their industry.

43.     Both Chris Yackel and Brian Lodwig have independent recollection of the October 13, 2011 meeting and these discussions.

44.     Like the work she performed for RFAL, Dr. Brightman understood that she was being offered additional stock options to be provided when Defendant went public for promoting Fractora as follows: (1) 5,000 yearly for meetings (derm meetings, society meetings, aesthetic meetings); (2) 5,000 shares of stock annually for any publications obtained for Fractora; (3) 5,000 shares of stock annually per international meeting; and 5,000 yearly for taking potential prospect calls/emails answering their questions regarding Fractora, and she accepted the offer.

45.     Based on this compensation arrangement proposed by Lodwig, Dr. Brightman agreed to provide – and did in fact provide – numerous services for InMode, including but not limited to:

        a.     Providing product feedback and working to produce photos and information from non-clinical trials of the Fractora device.

        b.     Handling and responding to phone calls from InMode and other physicians regarding her work with InMode's Fractora technologies.

46.     For the scope of additional works that Dr. Brightman provided to InMode to develop with a goal of promoting Fractora from 2011 through 2012, she was to receive 5,000 options per year for a total of 10,000.

47.     At all times herein, Mizrahy and Lodwig were duly authorized representative of InMode and / or had the actual and/or apparent authority to act and negotiate with Dr. Brightman on behalf of InMode. Dr. Brightman reasonably and justifiably relied on Lodwig's actual or apparent authority to transact business of InMode by providing services and devoting time for the benefit of InMode.

48.     Lodwig advised Dr. Brightman that the options were to be of the same kind that Lodwig himself would receive as an InMode executive, though the precise value of each share of stock would not be known until the company went public.

49.     Dr. Brightman reasonably relied on Lodwig's statements and his actual / apparent authority to transact business of InMode and, this reliance was manifested by Dr. Brightman devoting significant effort and time providing services of value to InMode.

50.     Dr. Brightman performed her part of the contract relating to Fractora, but received no additional monetary compensation for any of the foregoing services, in violation of the parties' industry-standard agreement, which Dr. Brightman understood to include compensation with stock options as promised on multiple occasions by Lodwig with Mizrahy's approval.

51.     In consideration for her consulting, marketing and sales assistance to InMode, Lodwig and Mizrahy had agreed to pay Dr. Brightman a total of additional 10,000 options in InMode stock at $1.00 per option, available when the Defendant went public. The terms of these options were identical to the terms of the options offered to Dr. Brightman in exchange for her marketing and sales-related services. At this time, Lodwig still had the actual and/or apparent authority to transact business on behalf of InMode.

52.     With this arrangement, and in reliance on Lodwig's authority and statements, Dr. Brightman completed the work described above which was very valuable and benefitted InMode.

53.     Dr. Brightman did not receive compensation for nor was she compensated with the additional stock options promised to her for her separate work relating to Fractora.

54.     On or around August 8, 2019, InMode made its initial public offering.  The stock

subsequently split in 2021 on a 2:1 basis. Dr. Brightman is owed 125,000 shares.[1]

55.     On or about April 12, 2021, Dr. Brightman learned of InMode having gone public and she emailed Mizrahy about original 7,500 options she had been promised. Mizrahy responded on or about April 14, 2021 advising that Dr. Brightman's options were expired.

56.     As of the date of this Complaint, Dr. Brightman has not received any of the stock options she was promised under the Clinical Trial Agreement, or for the work performed for RFAL and Fractora. Further, Dr. Brightman was advised by Mizrahy or other InMode personnel that InMode will not fulfill its promises.

## FIRST CAUSE OF ACTION

### (Negligent Misrepresentation)

57.     Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

58.     Plaintiff and Defendant were in a privity or privity-like relationship, because Defendant hired Plaintiff to perform services for it.

59.     Defendant, in the course of action in which it had a pecuniary interest, failed to exercise reasonable care or competence in obtaining or communicating information to Dr. Brightman as set forth above.

60.     Such information included, without limitation, that Dr. Brightman was to receive 45,000 stock options in InMode in exchange for her additional work such as presentations, publications, speaking with other physicians etc. in order to promote RFAL, and that no documentation of this arrangement was needed.

61.     Such information likewise included, without limitation, that Dr. Brightman was to receive 10,000 stock options in InMode in exchange for her additional work such as presentations, publications, speaking with other physicians etc. in order to promote Fractora, and that no

---

[1] This is based on the original clinical trial promise of 7,500 shares, the promise of 45,000 shares for RFAL work, and the promise of 10,000 for Fractora work.  Based on the stock split, this amounts to 125,000 options / shares.

documentation of this arrangement was needed.

62.      Dr. Brightman justifiably relied on this information in providing services for InMode.

63.      Attached as Exhibit A to this Complaint is a declaration of Brian Lodwig, who at all relevant times was the president of Defendant.  In it he testifies that either he or Mr. Misrahy did in fact make all of the above representations to Plaintiff on behalf of the Defendant.

64.      InMode stock went public in approximately August 2019 and appreciated significantly ever since and the stock was split 2:1. The high value of InMode following the 2:1 split was priced as high as $99.27/share.  Dr. Brightman is entitled to damages based on the 2:1 split and highest share value of $99.27 / share.

65.      As a direct and proximate result of Defendant's conduct, Dr. Brightman has suffered damages in an amount in excess of seventy-five thousand dollars ($75,000), plus interest.

66.       Dr. Brightman has been required to retain the services to prosecute this action and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein.

## SECOND CAUSE OF ACTION

### (Promissory Estoppel)

67.      Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

68.      Beginning in 2009, at other dates and times indicated herein, Defendant, through Lodwig and Mizrahy, requested that Dr. Brightman perform various services for InMode.

69.      Defendant, through Lodwig and Mizrahy, unequivocally represented to Dr. Brightman that it would compensate Dr. Brightman with stock options in InMode for her services to InMode for the Fractora product and for other work.

70.      Lodwig and Mizrahy were at all times acting as Defendant's duly authorized agents and/or had actual and/or apparent authority to transact business on Defendant's behalf with Dr. Brightman.

71.      Defendant, through Lodwig and Mizrahy, intended that Dr. Brightman rely upon

the express statements that Dr. Brightman would be compensated with stock options as set forth above in exchange for her time and effort on behalf of InMode.

72.    Dr. Brightman reasonably relied upon Defendant's representations and promises in belief that she would in fact receive such compensation for her services, and as such did not request or obtain monetary compensation for her time and valuable services, all to her detriment.

73.    Defendant failed to compensate Dr. Brightman with the promised InMode stock options in consideration of her work for the Fractora product.

74.    Dr. Brightman is entitled under principles of promissory estoppel and/or quantum meruit to be compensated by Defendant with the entire amount of stock options promised and owed to her by Defendant.

75.    As a direct and proximate result of Defendant's conduct, Dr. Brightman has suffered damages in an amount in excess of seventy-five thousand dollars (75,000).

76.    Dr. Brightman has been required to retain the services of Lipson Neilson P.C. and local counsel to prosecute this action and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein.

## THIRD CAUSE OF ACTION

### (Unjust Enrichment)

77.    Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

78.    As set forth above, Dr. Brightman provided extensive services to Defendant, all of which she received no monetary compensation for despite assurances to the contrary.

79.    Dr. Brightman provided such services based on Defendant's assurances that she would be compensated with InMode stock options, which Defendant ultimately repudiated after receiving the benefit of Dr. Brightman's services.

80.    In light of Defendant's conduct set forth herein, Dr. Brightman should be compensated with the stock options Defendant promised her in the interests of equity.

81.    It would be against equity and good conscience to permit the defendant to retain

what is sought to be recovered.

82.     As a direct and proximate result of Defendant's conduct, Dr. Brightman has suffered damages in an amount in excess of seventy-five thousand dollars ($75,000).

83.     Dr. Brightman has been required to retain the services of Lipson Neilson P.C. and local counsel to prosecute this action and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein.

## FOURTH CAUSE OF ACTION

### (Fraud)

84.     Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

85.     Defendant, through Lodwig, represented and confirmed to Dr. Brightman in October 2011 that, in exchange for her services to InMode for the Fractora product, she would be compensated with stock options in InMode. Defendant advised Dr. Brightman that no documentation as to this arrangement was necessary. Further, that Mizrahy and Lodwig on behalf of InMode would "be sure to take care of Dr. Brightman" and that this was "all set."

86.     At all times relevant herein, Lodwig was acting with actual and/or apparent authority of Defendant.

87.     Defendant knew or should have known that these representations were false.

88.     Defendant intended for Dr. Brightman to rely on these representations.

89.     Dr. Brightman reasonably relied on these representations, as she performed the valuable services for Plaintiff for which she was to receive stock options as compensation.

90.     Dr. Brightman's reliance was to her detriment, as she received no other compensation for the significant time, effort, and resources she spent performing services for Plaintiff.

91.     Dr. Brightman only discovered those representations were false, and only could have discovered they were false, upon attempting to exercise her options in April of 2021.

92.     As a result of Plaintiff's fraud, Dr. Brightman has been damaged in an amount in excess of seventy-five thousand dollars ($75,000) plus punitive and/or exemplary damages as permitted by law.

93.     Dr. Brightman has been required to retain the services of Lipson Neilson P.C. and local counsel to prosecute this action and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein.

## FIFTH CAUSE OF ACTION

### (Declaratory Relief and Specific Performance)

94.     Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

95.     Dr. Brightman entered into contracts with InMode as set forth more fully above.

96.     For the first agreement, Mizrahy directed that a written agreement be sent to Dr. Brightman. However, the written agreement provided for 7,000 stock options when in fact it was agreed she would receive 7,500 options and additional, new terms and conditions were included that were not discussed or agreed to by the parties.

97.     Dr. Brightman confronted Mr. Mizrahy about the discrepancy. Mizrahy assured her that he would send a corrected agreement but insisted that she sign it pending receipt of the corrected version.

98.     In reliance on his assurance, the written agreement was signed and returned, and Dr. Brightman continued thereafter to provide new services unrelated to the purported written agreement.

99.     Mizrahy failed to send a corrected version to confirm the original agreement of the parties.

100.    As for the other agreements related to new work Dr. Brightman was asked to perform on matters unrelated to the purported written agreement, Dr. Brightman at all times acted in good faith and substantially performed all of the contractual obligations requested of her by

InMode.

101.    InMode accepted the benefit of Dr. Brightman's work and never expressed any dissatisfaction with her work.

102.    It is within InMode's power to perform its obligations to deliver stock owed to Dr. Brightman.

103.    InMode has failed and refused without justification to deliver stock options owed to Dr. Brightman and is in breach of contract.

104.    Dr. Brightman is entitled damages for the highest value since InMode went public the 125,000 shares of InMode stock which she worked to obtain.

105.    Dr. Brightman is alternatively entitled to an order requiring InMode to perform its obligations and deliver the options it previously agreed to provide together with all other damages, attorney fees, costs and interest allowed by law.

106.    There is an actual and substantial controversy between the parties, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that InMode breached its obligations to Dr. Brightman and, further, order and direct that InMode specifically perform it obligations to Dr. Brightman by delivering the stock she is entitled to recover.

107.    Dr. Brightman has been required to retain the services of Lipson Neilson P.C. and local counsel to prosecute this action and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein.

## <u>SIXTH CAUSE OF ACTION</u>

### Breach of Implied Covenants of Good Faith and Fair Dealing

108.    Dr. Brightman realleges and incorporates each and every one of the allegations contained in the preceding paragraphs as if set forth fully herein.

109.    Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

110.    New York law recognizes in every contract there an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other

party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.

111.    A party to a contract breaches these duties when their conduct frustrates the purpose of the contract, is often described as bad faith, and for example is identified by, "evasion of the spirit of the bargain," "abuse of a power to specify terms," "interference with or failure to cooperate in the other party's performance," and willful rendering of imperfect performance.

112.    InMode breached the implied covenant of good faith and fair dealing by, among other things, refusing to cooperate with Lori's efforts to obtain stock she was promised resulting in a significant diminution of value of the shares.

113.    Dr. Brightman is entitled to recover damages for the highest value since InMode went public the 125,000 shares of InMode stock which she worked to obtain, together with all other consequential damages such as attorney fees, costs and interest allowed by law.

114.    Dr. Brightman has been required to retain the services of Berlandi Nussbaum & Reitzas LLP and Lipson Neilson P.C. to prosecute this action, and is entitled to recover an award of reasonable attorneys' fees and costs incurred herein.


**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for relief in favor of Plaintiff and against Defendant as follows:

1.      For damages to which Plaintiffs are entitled in an amount in excess of seventy-five thousand dollars ($75,000);

2.      For Declaratory Judgment that InMode breached its obligations to Dr. Brightman;

3.      Specific performance of InMode's contractual obligations to Plaintiffs;

4.      For punitive damages and permitted as otherwise allowed by law;

5.      For pre-and post-judgment interest;

6.      For all attorneys' fees and costs of suit; and / or

7.      For such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:      July 8, 2022
             New York, New York


                              **BERLANDI NUSSBAUM & REITZAS LLP**

                     By:      __/s/ Joshua T. Reitzas_____
                              Joshua T. Reitzas (JR2149)
                              125 Park Avenue, 25th Floor
                              New York, New York 10017
                              (212) 804-6329 (Ph)
                              (646) 461-2312 (fax)
                              *Attorneys for Plaintiff*
                              *Dr. Lori A. Brightman*